J-A34017-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JASON GARDNER | |
| Appellant | No. 196 MDA 2015 |

Appeal from the Judgment of Sentence September 19, 2014
In the Court of Common Pleas of Lycoming County
Criminal Division at No(s): CP-41-CR-0000410-2013

BEFORE:  PANELLA, J., OTT, J., and JENKINS, J.

MEMORANDUM BY OTT, J.:                    **FILED APRIL 11, 2016**

Jason Gardner appeals from the judgment of sentence imposed on September 19, 2014, in the Court of Common Pleas of Lycoming County. On that same day, a jury convicted Gardner of second-degree murder, robbery, conspiracy to commit robbery, and flight to avoid apprehension, trial, or punishment.[1]  The court sentenced Gardner to life imprisonment without the possibility of parole.  On appeal, Gardner raises sufficiency, weight, evidentiary, and suppression issues.  For the reasons below, we affirm on the basis of the trial court's opinions.

Gardner's convictions stem from the January 9, 2013, fatal shooting of the victim, Terrell Henderson-Littles, in an alley in Williamsport,

_____

[1]  18 Pa.C.S. §§ 2502(b), 3701(a)(1)(ii), 903(a), and 5126(a), respectively.

Pennsylvania. In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case. *See* Trial Court Opinion, 3/25/2015, at 1-12. Therefore, we have no reason to restate them herein.

Gardner presents the following six issues for our review:

1. Whether the trial court erred in finding that the Commonwealth presented sufficient evidence of robbery, conspiracy to commit robbery and murder in the second degree when there was no evidence of a taking required for the robbery?

2. Whether the court erred in upholding the verdicts when the weight of the evidence was against the verdict?

3. Whether the court erred in precluding evidence of a Commonwealth witness's prior use and possession of a firearm when the witness was a co-defendant in a murder case?

4. Whether the trial court erred in permitting the Commonwealth to play recorded telephone conversations between [Gardner] and a third party when there was no probative value to those calls?

5. Whether the court erred in permitting the Commonwealth to use a visual aid during its closing that was not supported by the evidence nor was it ever admitted as an exhibit?

6. Whether the court erred in failing to grant a motion to suppress statements when there was no continuation of interrogation as a result of being transported from Easton to Williamsport, [Pennsylvania]?

Gardner's Brief at 4-5.

After a thorough review of the record, the briefs of the parties, the applicable law and standard of review, and the well-reasoned opinions of the Honorable Nancy L. Butts, we conclude Gardner's issues merit no relief.

- 2 -

With respect to issues one, two, three, and four, the trial court's Pa.R.A.P. 1925(a) opinion comprehensively discusses and properly disposes of these questions. *See* Trial Court Opinion, 3/25/2015, at 13-21 (finding: (1) there was sufficient evidence to convict Gardner of robbery, second-degree murder, and conspiracy where the evidence established Gardner was brought to Williamsport to rob people, he asked permission to rob the victim, he pulled out a gun and shot the victim, the victim died as a result of the gunshot, and he told a third-party that he took about three bags of marijuana from the victim;[2] (2) the verdict was not against the weight of the evidence and did not shock the trial court's conscience[3] where (a) Gardner's

---

[2]  We note that Gardner included in his sufficiency argument two claims regarding the preliminary hearing. He asserts: (1) there was no evidence of taking presented at the preliminary hearing to support the *prima facie* case of robbery and (2) the Commonwealth's use of Shabazz's statement violated **Bruton v. United States**, 391 U.S. 123 (1968). *See* Gardner's Brief at 12, 15. "[I]t is well-settled that errors at a preliminary hearing regarding the sufficiency of the evidence are considered harmless if the defendant is found guilty at trial." **Commonwealth v. Ricker**, 120 A.3d 349, 353 (Pa. Super. 2015). Therefore, we need not address these claims further.

Nevertheless, we note the trial court addressed Gardner's challenge to a *prima facie* case of robbery in its September 30, 2013, opinion. *See* Trial Court Opinion, 9/30/2013, at 7-9. Moreover, with respect to Shabazz's statement, Gardner concedes there was no joint trial in the present matter and therefore, **Bruton** does not apply. *See* Gardner's Brief at 15.

[3]  With respect to weight claims, our standard of review is well-settled: "[A]n appellate court does not substitute its judgment for the finder of fact and consider the underlying question of whether the verdict is against the weight of the evidence, but, rather, determines only whether the trial court
*(Footnote Continued Next Page)*

cohort, Mirad Shabazz, testified that he gave Gardner permission to rob the victim, and Gardner said it was "a go" and pulled out a gun, (b) a jailhouse informant, Gage Michael Wood, stated that Gardner admitted he came to Williamsport to rob people and "shot the kid in the face" after the victim did not surrender his drugs, and (c) the jury received a corrupt and polluted source instruction regarding Shabazz and was aware of Wood's motive in testifying and received a cautionary instruction regarding the matter; (3) evidence regarding Shabazz and his prior use and possession of firearms (including an arrest in Easton, Pennsylvania while seen carrying a rifle and an outstanding weapons charge in New Jersey) was properly precluded because it was offered only to show that Shabazz had a propensity for violence and carrying weapons, which violated Pa.R.E. 404(b)(1); and (4) evidence of Gardner's recorded prison phone conversations regarding a "Bishop" was properly admitted as probative because Gardner's associate, Isaiah Fulton, testified that they called Gardner's gun a "Bishop," Gardner stated a "Bishop" was brought up with them on their trip to Williamsport, and Gardner had denied knowledge of a gun so that evidence of him talking about the gun would refute his lack of knowledge).

_(Footnote Continued)_ ————————————

abused its discretion in making its determination." **_Commonwealth v. Lyons_**, 79 A.3d 1053, 1067 (Pa. 2013), _cert. denied_, 134 S. Ct. 1792 (U.S. 2014)

With respect to Gardner's fifth issue, we note the following regarding the Commonwealth's use of a non-admitted visual aid during closing argument:

> "Visual aids may be used to assist the jury in understanding the evidence in appropriate cases, and permission to do so is within the sound discretion of the trial judge." **Commonwealth v. Pelzer**, 531 Pa. 235, 245, 612 A.2d 407, 412 (1992). This rule applies equally to demonstrative aids used during the actual trial phase and during the parties' opening and closing arguments. Moreover, it is well-settled that, during closing arguments, a prosecutor must be given reasonable latitude to present the Commonwealth's theory of the case provided that the evidence and the inferences derived therefrom reasonably support such a scenario. **See**, **e.g.**, **Commonwealth v. Persichini**, 444 Pa. Super. 110, 125, 663 A.2d 699, 706 (1995).

**Commonwealth v. Rickabaugh**, 706 A.2d 826, 837 (Pa. Super. 1997), *appeal denied*, 736 A.2d 603 (Pa. 1999).

Here, the prosecutor explained his use for the aid: "But I wanted to state that Mirad Shabazz in his testimony indicates that at the time of the shooting Gardner was standing in direct front of him in a south direction and that the victim was to his left." N.T., 9/18/2014, at 184.

The following exchange then occurred:

THE COURT: So [the prosecutor's] choosing to focus on one item of testimony rather than another.

[Defense counsel]: Fine. But, Your Honor, again, my objection --

THE COURT: Yeah.

[Defense counsel]: You have my objection.

THE COURT: I do. And, again, [the prosecutor's] going to couch this as it's not labeled as an exhibit. It's something that's -- ladies and gentleman, you know, I've put this together based upon my recollection of the testimony. You know, you heard the judge ad nauseam say it's your recollection that controls. But I remember that when Mirad Shabazz testified this is where he had everybody placed.

[Defense counsel]: See, my recollection is different than that. And, again, it's obviously the jury. But okay.

THE COURT: Yeah. And I think that's where we're dealing with it, you know.

*Id.* at 184-185.

As pointed out by the trial court, Shabazz did testify that Gardner was in front of him at the time the gun went off and the victim was to the left of him. N.T., 9/15/2014, at 109.

During closing arguments, the prosecutor stated:

But we know based upon where the body fell dead standing that there was movement and we know the way the bullet was passing through his head from left to right, front to back, and up, his feet where he stands left to right, front to back, and up, that the bullet passes through Terrell Littles' head and up through that drip edge and up into the sky. Colton Engel[, a friend of the victim,] doesn't see it because he can't see what's happening over here, but he does see Mirad Shabazz who is raising his hand in this direction, raising his hands maybe because he's surprised at what the heck is going on over here between these two. Maybe because things are getting out of hand with the robbery. We don't know, but Mirad Shabazz takes the stand and says when that gun goes off Jason Gardner is in front of me, Terrell Littles is to my left. And when he says that it clicks with the Commonwealth because we say well, that's what our physical evidence shows. That is exactly what our physical evidence shows.

N.T., 9/19/2014, at 29-30.

- 6 -

In its opinion, the court found it did not err in permitting the Commonwealth to use a visual aid during closing arguments because the aid was supported by Shabazz's testimony as to where Gardner and the victim were standing in relation to him. **See** Trial Court Opinion, 3/25/2015, at 19-20.

Given the foregoing, particularly that a prosecutor must be given reasonable latitude to present the Commonwealth's theory of the case during closing arguments, and based upon our review of the record, in which there were many individuals present at the shooting and the Commonwealth was using the aid to show where the actors were located, we conclude the trial court did not abuse its discretion in permitting the Commonwealth's use of the visual aid.

With respect to Gardner's remaining claim, his sixth, the trial court correctly addressed the issue in its September 30, 2013, opinion and order.[4] In denying the motion to suppress, the trial court noted Gardner was interviewed by the same officer that provided him with the earlier **Miranda**[5] warnings, the second interview occurred approximately two and a half hours after the warnings were initially given, and the interviews occurred in different locations. **See** Trial Court Opinion, at 9/30/2013, at 5. The court

---

[4] The court incorporated its analysis from the September 30, 2013, opinion in its Rule 1925(a) opinion. **See** Trial Court Opinion, 3/25/2015, at 13.

[5] **Miranda v. Arizona**, 384 U.S. 436 (1966).

found that while the different locations of the interviews supported Gardner's position that he should have been re-advised of his rights, that was mitigated by fact that the officers advised Gardner prior to the trip back to Williamsport and during the first interview that they would continue to talk in the police vehicle. *Id.* The court concluded that because it was the same officer conducting both interviews and there was a short amount of time between the inquiries, these factors further supported the determination that the police were not required to re-advise Gardner of his rights. *Id.* at 5-6. Moreover, the court indicated that in his first statement, Gardner averred he and Shabazz went straight to their friend's apartment and did not see the victim or a shooting. *See* Trial Court Opinion, at 9/30/2013, at 6. In the second statement, he said that he and Shabazz were at the scene of the shooting. *Id.* The court emphasized that while these statements were different, Gardner merely acknowledged he was at the scene, but did not admit that he was involved in the shooting in any way. *Id.* Therefore, the court found that these two statements were not substantively different. *Id.* As such, the court concluded that based on the facts of the case, the police did not have to re-inform Gardner of his *Miranda* rights before talking to him in the police vehicle. *Id.*

We conclude that the trial court's opinions properly dispose of the issues in this case. Accordingly, we affirm on the basis of those opinions with respect to Gardner's numerous claims,[6] with one additional comment.

At several points in Gardner's brief, Gardner alleges the only credible evidence is his own testimony, which he claims is more reliable than that of the other witnesses. We emphasize that "the fact-finder is free to believe all, part, or none of the evidence, and credibility determinations rest solely within the purview of the fact-finder." ***Commonwealth v. Flor***, 998 A.2d 606, 626 (Pa. 2010). It follows from the above principle that the jury was not required to believe Gardner's testimony and that it could rely on the testimony from the other witnesses, which implicated Gardner as the shooter.

Judgment of sentence affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/11/2016

_____

[6] We note Gardner raised additional claims with the trial court, which it analyzed in its opinions, that are currently not before us on direct appeal. Accordingly, we need not address those claims further.

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA   :
                                         :

        v.                              :      CR: 410-2013
                                         :      CRIMINAL DIVISION

JASON GARDNER,                    :
        Defendant              :

## OPINION AND ORDER

The Defendant filed an Omnibus Pre-trial Motion on April 11, 2013. A hearing on the motion was heard on July 11, 2013 and July 12, 2013.

*Background*

On January 9, 2013, Terell Henderson-Littles (victim) was shot to death in the rear parking lot of 1107 W 4th Street. On January 19, 2013, Easton Police Department contacted Williamsport Bureau of Police (WBP) and advised them that they had one of the suspected shooters, Mirad Shabazz (Shabazz). At approximately 6:00 PM, Agent Kontz (Kontz), Agent Peacock (Peacock), Agent Dincher (Dincher), and Captain Miller (Miller) of the WBP arrived in Easton, PA. Kontz and Peacock interviewed Shabazz while Dincher and Miller went to 1125 Ferry Street to find the other suspect in the shooting, Jason Gardner (Defendant).

At approximately 6:36 PM, Dincher, Miller, and three Easton Police officers arrived at 1125 Ferry Street, where the Defendant was suspected to be located. A black male answered the door and identified himself as "Shawn." The black male began to walk up the stairs as a black female came to the door and identified "Shawn" as the Defendant. The Defendant grabbed and threw a small child at one of the Easton Police officers and began to run to the back of the house. Dincher pursued and as they entered the kitchen in the rear of the house Dincher grabbed the



APPENDIX "B"

Defendant and they broke through the back door landing on an outside patio. Easton Police arrested the Defendant and he was transported to the Easton Police Department (EPD).

Kontz and Peacock interviewed the Defendant after he arrived at the EPD. Kontz first advised the Defendant of his Miranda rights, which the Defendant waived and signed a waiver form at 7:11 PM. The Defendant was interviewed for approximately an hour and forty-five (45) minutes. During the interview the Defendant stated that he was in Williamsport around the time of the shooting. On January 9, 2013, the Defendant, Shabazz and two (2) other individuals went to purchase marijuana. Commonwealth Ex. 3. The Defendant stated that he and Shabazz left the other individuals prior to the purchase and they walked directly back to the apartment at which they were staying. The Defendant stated that he did not see the victim or the shooting. While the interview was ending Kontz and Peacock told the Defendant that they would continue to talk on the two and a half (2 ½) hour drive back to Williamsport.

Following the interview, Kontz and the rest of the WBP ate pizza provided by the EPD while the Defendant's shoes were being obtained from a locker. After the Defendant's shoes were returned, Miller and Kontz transported the Defendant by vehicle back to Williamsport at 9:30 PM. Kontz estimated that it took approximately thirty (30) minutes from the end of the interview till the Defendant was in the vehicle.

Kontz and Miller stopped at a McDonald's approximately two (2) minutes away from EPD and got the Defendant food. While the Defendant was eating he called his girlfriend and talked to her for five (5) to ten (10) minutes. Following the phone call, Kontz asked the Defendant about his daughter. The Defendant stated that he would not see his daughter again and that his life was over. Kontz responded that he was just at a bad place at a bad time. The

2

Defendant then said Shabazz was like a brother to him and that they were at the scene of the shooting.

On January 21, 2013, the Defendant was brought back to WBP from the county prison to finish being processed due to computer issues on January 19th. The Defendant was told that Shabazz had talked to police and he stated that he also wanted to talk. The Defendant again waived his Miranda warnings and made a statement to police.

On April 11, 2013, the Defendant filed an Omnibus Pre-Trial Motion that argued that "statements were obtained in violation of Defendant's rights as provided in Article 1 Sections 8 and 9 of the Pennsylvania constitution as well as the Fourth, Fifth and Fourteenth Amendments of the United States Constitution as well as Miranda v. Arizona." Following the hearing, the Defendant specified that he should have been rewarned of his Miranda rights before he made statements to police in the vehicle. In addition, the Defendant's inadmissible statements resulted in the January 21, 2013 confession and should also be suppressed.

### Motion to Suppress

Defense counsel alleges that the Defendant was not properly re-advised of his Miranda rights prior to being questioned while he was being driven back to Williamsport. The purpose of Miranda "is to assure that the individual's right to choose between silence and speech remains unfettered throughout the interrogation process." Commonwealth v. Wideman, 334 A.2d 594, 597 (Pa. 1975).

> An accused, of course, need not be reinformed of his rights, and asked whether he wishes to assert them each time he is asked a question. On the other hand, we have held that the accused must be so reinformed, and given a new opportunity to assert constitutional rights when warranted by the circumstances. Several "objective indicia" have been noted as significant in determining the issue: we have considered (1) the time lapse between the last Miranda warnings and the accused's statement; (2) interruptions in the continuity of the interrogation; (3) whether there was a change of location between the place where

3

the last Miranda warnings were given and the place where the accused's statement was made; (4) whether the same officer who gave the warnings also conducted the interrogation resulting in the accused's statement; and (5) whether the statement elicited during the complained of interrogation differed significantly from other statements which had been preceded by Miranda warnings.

Id. at 598 (citations omitted).

In Wideman, the defendant and his wife arrived at the police administration building at 5:15 AM. Id. at 596. At 5:45 AM, the defendant was given Miranda warnings by Detective Bacher but no questions were asked. At 6:45 AM, Detective Basmajian re-warned the defendant and asked him questions for about a half an hour. At 10:30 AM, the defendant was taken to an interrogation room and given a lie detector test. The defendant was then interrogated again by Detective Melfi, spoke with his wife, and took a three and a half (3 ½) hour nap. From 5:30 to 6:00 PM the defendant was interrogated by Detective Kuester. Id. at 596-97. At 6:45 PM, Detective Smith interrogated the defendant and he admitted to a shooting. Id. at 597. The Defendant had not been given his Miranda warnings since 6:45 AM.

The Supreme Court of Pennsylvania found that the defendant should have been re-advised of his Miranda rights. Id. at 598-99. The Supreme Court noted that continuity of interrogation was broken on several occasions, the delay was twelve (12) hours, a different officer gave the Miranda warnings than interrogated the defendant, and there was a material difference between the statement made when Miranda warnings were given and twelve (12) hours later. See also Commonwealth v. Wideman, 334 A.2d 594, 599 (Pa. 1975) (determining that rewarning was necessary when twelve hours elapsed from the time of the Miranda warnings and the interrogation, a different officer questioned the defendant, and the defendant was moved to another location). In addition, the Supreme Court suppressed the defendant's subsequent formal, written statement as it was a product of the inadmissible oral confession.

4

On the other hand, in Gray, the defendant was questioned about a murder and given his Miranda warnings at 6:00 PM. Commonwealth v. Gray, 374 A.2d 1285 (Pa. 1977). The defendant denied any knowledge of the homicide during the forty-five (45) minute interrogation. After an approximate hour and a half break, the defendant was re-questioned by another officer and was not re-advised of his Miranda warnings. The Defendant then stated that he was in the victim's house.

The Supreme Court of Pennsylvania ruled that the interrogation should not have been suppressed. The Supreme Court noted that "[w]hile a different officer conducted the second interview, the statements did not materially differ. In the first, [defendant] admitted being with the victim outside her house. In the second, he added that he accompanied her inside and saw her fall against a table. After placing her on the couch, [defendant] stated that he left." Id. at 1289. Further, the time between the Miranda warnings and the interrogation was two (2) hours and it was conducted in the same room. Id.; see also Commonwealth v. Ferguson, 282 A.2d 378, 379-80 (Pa. 1971) (finding that rewarning was not necessary when a different officer than the one that gave the warnings conducted the interrogation).

Here, the Defendant was interviewed by the same officer that gave the Miranda warnings, the second interview occurred approximately two and a half (2 ½) hours after the warnings were initially given, and the interviews occurred in different locations. The different locations of the interviews support the Defendant's position that he should have been re-advised of his rights. This factor, however, is mitigated by the officers' reference that they would continue talking in the police vehicle. The Defendant was advised prior to the trip back to Williamsport and during the first interview that they would continue to talk in the police vehicle. In addition, the same

5

officer conducting both interviews and the time between the interviews supports the Commonwealth's position that police were not required to re-advise the Defendant of his rights.

Another of the "objective indicia" used by courts is whether the first and second statements significantly differ. In the Defendant's first statement he stated that he and Shabazz went straight to their friend's apartment and did not see the victim or a shooting.[1] In the Defendant second statement he stated that he and Shabazz were at the scene of the shooting. The Defendant's subsequent statement is different than the first; however, he merely states that he was at the scene of the shooting. The Defendant did not state that he was involved in the shooting in any way. In Gray, the defendant denied any knowledge of a homicide and then later said that he was inside the house and saw the victim fall to the ground. The facts here are similar to Gray, in that the Defendant first denied knowledge and then stated that he was at the scene. Therefore, this Court finds that the first and second statements by the Defendant were not significantly different.

Based on the facts of this case, the Court finds that police did not have to re-inform the Defendant before talking to him in the police vehicle. The first interview of the Defendant ended with police stating that they would continue to talk during the drive to Williamsport. In addition, the statements were not significantly different, occurred within a short period of time from each other, and were conducted by the same officer.

*Motion to Dismiss*

The Defendant contends that the Commonwealth failed to establish a *prima facie* case for the robbery charges. Specifically, it is alleged that the Commonwealth did not provide any

---

[1] The Defendant's initial statement to police was that he was in the general area of the shooting but did not know anything about it.

6

evidence that there was any sort of taking or theft in this matter. A person is guilty of robbery if during the course of committing a theft he either:

(i) inflicts serious bodily injury upon another;

(ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury;

(iii) commits or threatens immediately to commit any felony of the first or second degree;

(iv) inflicts bodily injury upon another or threatens another with or intentionally puts him in fear of immediate bodily injury;

(v) physically takes or removes property from the person of another by force however slight; or

(vi) takes or removes the money of a financial institution without the permission of the financial institution by making a demand of an employee of the financial institution orally or in writing with the intent to deprive the financial institution thereof.

18 Pa.C.S. § 3701(a)(1). Further, "[a]n act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission."

After reviewing the Preliminary Hearing transcript, the Court finds that the Commonwealth has sufficiently established a *prima facie* case for all the robbery charges. Isaiah Fulton (Fulton) testified that before the co-Defendants went to buy marijuana from the victim, Gardner asked Shabazz if he would go with him to rob him. N.T., March 8, 2013, p. 45, 59. After the shooting occurred Shabazz told Fulton that Gardner shot the victim after he refused to give them more marijuana and reached for the gun:

HOFFA: So you didn't ask anybody what happened?

FULTON: Yeah. I asked 'em what happened and they told me.

HOFFA: Who told you?

FULTON: Mirad.

7

HOFFA:                    And when you say Mirad you're talking about Shabazz?

FULTON:                   Yeah.

HOFFA:                    And what did he tell you again?

FULTON:                   He said that Jason shot the boy.

HOFFA:                    Did he say why?

FULTON:                   He said because he tried to reach for the gun.

HOFFA:                    Did he – well, what – did he tell you if they took the pot or did they pay for the weed? Did he tell you that?

FULTON:                   No, he say they took it.

HOFFA:                    He took it.

FULTON:                   And handed him the weed and he didn't want to give the rest of it so he tried to, like, wrestle for the gun and he got shot.

. . . .

HOFFA:                    And then what else did you say happened after that? He gave you the weed and he wouldn't give him the rest?

FULTON:                   Right. That's what he told me – he said that he – I guess he tried to – I don't really know. He just said that he – he wasn't trying to give the rest of the weed up and he tried to wrestle him for the gun.

HOFFA:                    He didn't want to give up the rest of the weed and he tried to wrestle him for the gun.

FULTON:                   Yeah.

HOFFA:                    And that's what Shabazz is telling you?

FULTON:                   Right.

Id. at 70-71. In addition, Shabazz made similar statements to Agent Raymond Kontz of the

Williamsport Bureau of Police:

8

| | |
|---|---|
| COMMONWEALTH: | And in that interview with Mr. Shabazz did he make any – what did he tell you with regard to the homicide of Terell Littles? |
| KONTZ: | He indicated that the shooter would have been Jason Gardner, that at one point during the commission of a robbery that the victim had gotten brave and reached out to grab the gun and at that point that Mr. Gardner had to shoot him. |
| COMMONWEALTH: | Did Mr. Shabazz indicate to you whether he knew or didn't know that this was going to be a robbery? |
| KONTZ: | He indicated that they were going there to commit the robbery, that as they approached the victim was still inside a vehicle and that he had actually told Mr. Gardner that as long as they were in the vehicle that the robbery wouldn't take place. They weren't familiar with the area. They were afraid they would be taken somewhere where they couldn't find their way back to the residence that they were staying. When Mr. Littles got out of the vehicle Shabazz – or I'm sorry, Mr. Gardner turned to Shabazz and said it was on, so at that time the robbery was going to take place. |

Id. at 84. The Defendant points out that Colton Engel (Engel) did not observe a taking. The testimony, however, established that Engel was not observing them the entire time and also he did not see what Gardner was doing while he was watching Shabazz. Id. at 22, 35.

### *Motion for Severance*

The Defendant contends that the co-Defendants' case should be severed due to a potential violation of Bruton, which states that an incriminating statement by a non-testifying co-defendant violates the other defendant's right to cross-examine as guaranteed by the Confrontation Clause of the Sixth Amendment. Bruton v. U.S., 391 U.S. 123 (1968). There is no violation, however, if the incriminating statement is redacted and the trial court gives an accurate and repeated cautionary charge. See Commonwealth v. Travers, 768 A.2d 845 (Pa.

9

2001); <u>Commonwealth v. Johnson</u>, 378 A.2d 859 (Pa. 1977); <u>Commonwealth v. Whitaker</u>, 878 A.2d 914 (Pa. Super. 2005).

Based on the law, the Court finds that severance of the co-Defendant's cases is not necessary if the Commonwealth redacts Shabazz's statement for use at trial. The Court will require that the Commonwealth provide defense counsel the redacted version of the statement at least sixty (60) days before the start of trial. This will give the Defendant adequate time to raise any issues from the redacted statement.

### ORDER

AND NOW, this 27th day of September, 2013, based upon the foregoing Opinion, the Court finds that the Williamsport Bureau of Police was not required to re-advise the Defendant of his rights prior to interviewing him again in their police vehicle. In addition, the Commonwealth established a *prima facie* case for the robbery charges. Therefore, the Defendant's Omnibus Pre-trial Motion is DENIED.

It is ORDERED and DIRECTED that the Commonwealth provide defense counsel with the redacted version of Shabazz's incriminating statement at least sixty (60) days before the start of trial.

By the Court,

Nancy L. Butts, President Judge

xc:    DA
       Robert Hoffa, Esq.

10

IN THE COURT OF COMMON PLEAS OF LYCOMING COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CR-410-2013 |
| | : | |
| v. | : | |
| | : | CRIMINAL DIVISION |
| JASON GARDNER, | : | |
| Defendant | : | 1925(a) Opinion |

## OPINION IN SUPPORT OF ORDER IN COMPLIANCE WITH RULE 1925(a) OF THE RULES OF APPELLATE PROCEDURE

This opinion is written in support of the Court's sentencing order of September 19, 2014.

## I. Background

On January 9, 2013, Terrell Henderson-Littles (Littles) was shot and killed in an alley in Williamsport. On September 19, 2014, a jury found the Defendant guilty of second-degree murder,[1] robbery (threatens with or intentionally puts in fear of serious bodily injury),[2] conspiracy to commit robbery,[3] and flight to avoid apprehension, trial, or punishment.[4] The jury found the Defendant not guilty of conspiracy to commit murder,[5] aggravated assault,[6] robbery (inflicts serious bodily injury),[7] firearms not to be carried without a license,[8] prohibited offensive weapon,[9] and possessing instruments of crime.[10] On September 19, 2014, the Defendant was sentenced to imprisonment for life without the possibility of parole.

---

[1] 18 Pa.C.S. § 2502(b).
[2] 18 Pa.C.S. § 3701(a)(1)(ii). The Court notes that there is no distinction between the robbery counts on the verdict slip, but the Court instructed the jury, "The first charge and the way I also read everything is I read them in the order in which they appear on the verdict slip." N.T., 9/19/14, at 55. The charge for robbery (inflicting serious bodily injury) was read before the charge for robbery (threaten with or intentionally put in fear of serious bodily injury). Id. at 66-68.
[3] 18 Pa.C.S. § 903(a) and 18 Pa.C.S. § 3701(a)(1).
[4] 18 Pa.C.S. § 5126(a).
[5] 18 Pa.C.S. § 903 and 18 Pa.C.S. § 2502.
[6] 18 Pa.C.S. § 2702(a)(1).
[7] 18 Pa.C.S. § 3701(a)(1)(i).
[8] 18 Pa.C.S. § 6106(a)(1).
[9] 18 Pa.C.S. § 908(a).
[10] 18 Pa.C.S. § 907(b).



APPENDIX "E"

## A. Colton Engel's Testimony

On January 9, 2013, Littles called Colton Engel (Engel) because Littles wanted a ride. Engel picked Littles up a few minutes after 5:00 P.M. in a red truck. As Engel was driving, Littles was talking on his phone and trying to locate the person to whom he was talking. At one point, Engel could see the screen of Littles' phone and the number of the phone used by the person talking to Littles.

Engel parked at the traffic light at intersection of Susquehanna Street and Fourth Street. He saw two people walking on Fourth Street. One of them was wearing a white sweatshirt with a hood that was up. The other was wearing a dark jacket with white stripes on the sleeves.

Littles exited the truck and met the two people. Littles called Engel and told him to go around the block because the light had turned green. Littles also told Engel to pick him up at the same spot.

Engel drove for about 45 seconds before returning to the area where Littles had exited the truck. As he was driving on Susquehanna Street, Engel saw Littles waving at him in an alley off the street. Engel turned left into the alley and then turned right into a parking lot next to the alley. He parked next to Littles, the person in the white sweatshirt, and the person in the dark jacket. Engel identified the Defendant as the person in the dark jacket and Mirad Shabazz (Shabazz) as the person in the white sweatshirt.

Engel stayed in the truck. He could not see Littles because Littles was standing next to the back tire on the passenger side of the truck. Shabazz was standing next to the passenger side of the truck where the front door and the back door meet. Littles could not see the Defendant because he was blocked by Shabazz.

Engel saw Shabazz's arm raise and heard a bang. Shabazz and the Defendant ran out of the alley. Littles was on the ground.

2

## B. Mirad Shabazz's Testimony

Shabazz lived in Easton, Pennsylvania. In early January of 2013, he received a call from Isaiah Fulton (Fulton), who lived in Williamsport. Fulton said that he was going to pick up Shabazz in Easton and bring him to Williamsport. Fulton and Antonio Carpenter (Carpenter) picked up Shabazz and the Defendant in Easton. The four eventually arrived in Williamsport. The Defendant had a sawed-off shotgun with him in Williamsport. He had brought it from Easton in a backpack. The gun had tape around the handle. While in Williamsport, the Defendant, Shabazz, Fulton, and Carpenter talked and smoked.

On January 9, 2013, the four were at Shontay Payton's (Payton) apartment in Williamsport. They were listening to music, talking, and smoking marijuana and cigarettes. Fulton told Shabazz that he was getting marijuana. Fulton, Carpenter, Shabazz, and the Defendant left Payton's apartment to get marijuana. The Defendant had Payton's phone when they left the apartment. He was wearing a black track jacket over a red sweatshirt with a hood. Shabazz was wearing a beige sweatshirt with a hood.

As they were walking, the Defendant said "something to [Shabazz] about robbing the kid" who they were going to meet for marijuana. The Defendant could not rob someone without Shabazz's permission because Shabazz was a higher rank in their gang. Shabazz told the Defendant that he could not rob "the kid." As they were walking, the Defendant answered Payton's phone. After he hung up, the Defendant said, "I told you all with the second weed man I'm gonna get – I'm gonna get this one." Shabazz thought that meant the Defendant was going to rob the person who they were meeting for marijuana. Shabazz again told the Defendant that he could not rob the person.

Shabazz and the Defendant split from Fulton and Carpenter. Shabazz and the Defendant went to buy marijuana from one person while Fulton and Carpenter went to buy marijuana from

3

another person. The Defendant kept asking Shabazz about robbing the person, and Shabazz eventually gave the Defendant permission to rob the person. As they were walking, the Defendant answered Payton's phone. The person on the phone told Shabazz and the Defendant to be at a certain intersection. When they got to the intersection, they saw a person walking out of a side street. Shabazz identified the person as the "the kid who got shot." As Littles was walking towards them, the Defendant said that it was "a go." Shabazz responded, "Alright, it's a go." Shabazz testified that "it's a go" meant that the Defendant could rob Littles.

Littles asked Shabazz and the Defendant if they were the people who wanted marijuana. The Defendant responded that they were. The Defendant said there were police on the street, so he wanted to go into a nearby alley. The Defendant, Shabazz, and Littles went into the alley. The Defendant asked to see the marijuana, and Littles gave him some bags of marijuana. The Defendant then handed the bags to Shabazz and asked Shabazz if he wanted the marijuana. Shabazz said that he wanted it.

A truck entered the alley and parked next to Shabazz, the Defendant, and Littles. Shabazz was texting on Fulton's phone when the Defendant pulled out a gun. Shabazz saw the gun and continued to text. The Defendant was in front of Shabazz; Littles was to Shabazz's left. Littles went for the gun, and Shabazz heard a bang.

The Defendant was frantic and jumpy after the bang. He told Shabazz, "Come on" and then ran out of the alley. Shabazz did not follow the Defendant. He walked out of the alley and eventually saw Carpenter and Fulton. The three walked towards Payton's apartment. They saw the Defendant when they got to a corner near Payton's apartment. Shabazz, the Defendant, Fulton, and Carpenter then went back to Payton's apartment.

When the four got back to Payton's apartment, Shabazz asked Payton for bleach, so the Defendant could wipe himself down. Payton gave Shabazz some type of cleaner in a spray

4

bottle. After Payton received a phone call, she pulled Fulton aside. Payton and Fulton argued before Payton left her apartment to go to her job. Shabazz, the Defendant, Carpenter, and Fulton left Payton's apartment five to ten minutes after Payton left.

From Payton's apartment, the four went to Brittney's house in Milton, Pennsylvania. On January 10, 2013, Shabazz and the Defendant left Milton and went back to Easton.

## C. Isaiah Fulton's Testimony

Fulton lived in New Berlin, Pennsylvania. In early January, he contacted Shabazz because he wanted Shabazz to come to Williamsport to hang out. Fulton and Carpenter went to Easton and picked up Shabazz and the Defendant. Fulton, the Defendant, Shabazz, and Carpenter spent most of their time at Payton's apartment, where they talked and smoked marijuana. The Defendant had a backpack with a gun inside it. The Defendant called the gun "Bishop."

On January 9, 2013, Fulton, the Defendant, Shabazz, and Carpenter were in Payton's apartment. When they ran out of marijuana, Payton sent text messages to people to get more. Somebody called Payton, and Payton gave money to Fulton. Fulton, Shabazz, the Defendant, and Carpenter left the apartment to meet the person who called Payton. As they were walking, somebody called Payton's phone, and since the Defendant had the phone, he answered it. The Defendant told Fulton, Shabazz, and Carpenter that somebody else had marijuana. The Defendant asked Shabazz to go with him to get marijuana from the other person. Shabazz said he would go, so Shabazz and the Defendant went one way while Fulton and Carpenter went another. When the group split, the Defendant was wearing his backpack, and his gun was inside the backpack.

Fulton and Carpenter were walking when they heard a gunshot and saw the Defendant running out of an alley. The Defendant did not approach them. Shabazz approached them and

5

told them to keep walking. They walked back to Payton's house and saw the Defendant. Fulton, the Defendant, Shabazz, and Carpenter left Payton's house and went to Milton to stay with Brittney. On January 10, 2013, the Defendant and Shabazz left Milton.

## D. Shontay Payton's Testimony

The Defendant, Shabazz, Carpenter, and Fulton spent time in Payton's apartment in early January of 2013. During this time, the Defendant had a backpack with him. On January 9, 2013, Fulton told Payton that he wanted marijuana. Via text message, Payton asked Brucilla Lowe (Lowe) for Littles' phone number, so Payton could find out if Littles had marijuana. Lowe did not respond, so Payton called Dayvon to see if he had marijuana. Dayvon agreed to meet Payton at a mini-mart. Payton gave $30 to Fulton, so he could buy marijuana from Dayvon. Fulton, the Defendant, Shabazz, and Carpenter left Payton's house to buy the marijuana. Before they left, Payton gave her phone to the Defendant because nobody else had a phone, and she did not want them to pass by Dayvon. The Defendant was wearing a black jacket with a white stripe. Underneath the black jacket, he was wearing a jean jacket, and underneath the jean jacket, he was wearing a red sweatshirt with a hood. Shabazz was wearing a white sweatshirt with a hood.

The Defendant, Shabazz, Fulton, and Carpenter retuned to Payton's house 45 minutes after they left. Payton did not see blood on the Defendant. She entered her room and shut the door. She heard the group talking, but she did not know what they were talking about.

Payton exited her room, and then smoked marijuana with the Defendant, Shabazz, Fulton, and Carpenter. Fulton told Payton to tell the police nothing if they came to her house. Payton said she was going to tell the police everything, and Fulton became upset.

Shabazz and the Defendant asked Payton if she had any bleach. Payton's roommate gave them cleaning spray. Shabazz and the Defendant then entered the bathroom and shut the door.

6

Lowe called Payton and asked her if she met with Littles because Littles was shot. Payton hung up and asked Fulton if they were involved in the shooting. Fulton responded that he did not know Littles. Payton then left her apartment to go to work. When she returned the apartment, the Defendant, Shabazz, Fulton, and Carpenter were gone.

## E. Brittney Jones' Testimony

Brittney Jones (Jones) lived in Milton, Pennsylvania. She is related to Fulton. In early January of 2013, Fulton and three other males unexpectedly came to her house. One of the males was the Defendant. The males stayed one night and left the next day.

## F. Gage Wood's Testimony

Gage Wood (Wood) was an inmate in Lycoming County Prison. He listened to other inmates and wrote down information to tell police in the hope of helping himself. In October of 2013, he was housed with the Defendant. Wood was having a conversation about shooting clay discs. The Defendant joined the conversation and said that he was "a shooter" and "about that life." Wood asked the Defendant if he was one of the people who were arrested for shooting Littles. The Defendant responded, "Yeah, me and my bro got booked for that." The Defendant told Wood that "his bro brought him down here to rob people." The Defendant also told Wood he "shot the kid in the face" with a sawed-off shotgun after the kid did not give up drugs. The Defendant said that he had heard Littles had a lot of drugs, and Wood asked the Defendant what he got from Littles. The Defendant responded that he got about three bags of marijuana, but he thought Littles had more.

## G. Defendant's Phone Calls while in Lycoming County Prison

The Commonwealth played two phone calls made from Lycoming County Prison on February 9, 2013. Agent Raymond Kontz (Kontz) testified that the Defendant was one of the

7

individuals talking on the calls. In one call, the Defendant says that "bishop" is up here and was in the car with him that night. He also says that "bishop" is short. In the other call, the Defendant tells a person that the person has to get something the next time the person is up here. The Defendant says that it is going to be hard for the person to get it. The Defendant tells the person to read his lips the next time he visits the prison.

## H. Testimony of Agent Raymond Kontz

Kontz is an officer with the Williamsport Bureau of Police. On January 9, 2013, he interviewed Engel, who said that a person in a white sweatshirt shot Littles. He said that he thought the person in the white sweatshirt shot Littles because he saw the person raise his arm and then heard a shot. On January 18, 2013, Kontz showed a photo array to Engel, and Engel identified Shabazz as the person who shot Littles.

On January 21, 2013, Kontz interviewed Shabazz, who told Kontz the approximate location of the gun used to shoot Littles. On January 22, 2013, police went to the location to search for the gun, but they did not find a gun. On January 25, 2013, police were contacted about a gun in the snow by a dumpster in the back of 901 Vine Avenue. Police went to a snowbank by the dumpster and found a sawed-off shotgun. The gun had tape around it.

Kontz searched the call log of a phone found next to Littles' body. Payton's phone number appears on January 9, 2013 at 5:11 P.M., 5:24 P.M., and 5:26 P.M.

## I. Testimony of Agent Trent Peacock

Trent Peacock (Peacock) is an officer with the Williamsport Bureau of Police. He saw a white phone and a small bag of marijuana next to Littles' body. Littles had on a wristwatch and a bracelet. Another phone was found in one of Littles' pocket. A wallet with no money was

8

found in one of Littles' pockets. A cigarette box was found in one of Littles' pockets. The box had five bags of marijuana in it. Bullet fragments were found in Littles' brain.

As Peacock was searching the area around the location of the shooting, he saw a hole in the drip edge of 329 Susquehanna Street. He cut the drip edge and removed the piece with the hole.

## J. Testimony of Lieutenant Arnold Duck

Arnold Duck (Duck) is an officer with the Williamsport Bureau of Police. He saw a small bag of marijuana next to Littles' body. He checked for fingerprints on the tape that was on the sawed-off shotgun, but he did not find any prints. Duck did not attempt to get fingerprints from the gun's safety or trigger because he did not want to destroy any potential DNA.

Duck removed a shot shell from the shotgun found in the snowbank. Duck testified that the shell had been fired because one end of it was expanded open.

## K. Elwood Spencer's Testimony

Elwood Spencer (Spencer) is a firearm examiner employed by the Pennsylvania State Police. Spencer received a shotgun and a shot shell from the Williamsport Bureau of Police. He determined that the shell had been discharged within the shotgun. The marking on the spent shell indicated that it had been made to hold 437.5 grains. The bullet fragments from Littles' brain weighed approximately 37.5 grains.

Spencer also examined the drip edge found in the area of the shooting. There was an inner hole and outer hole in the drip edge; both holes had lead around their margins.

## L. Joseph Kukosky's Testimony

Joseph Kukosky (Kukosky) is a forensic DNA scientist employed by the Pennsylvania State Police. Kukosky tested pants belonging to the Defendant. On one section of the pants,

9

there was a mixture of the Defendant's blood and an unknown person's blood. On another section of the pants, there was a mixture of three individuals' bloods. Neither Littles nor Shabazz were one of the individuals, but the Defendant could not be excluded as an individual.

Kukosky also tested boots belonging to Shabazz. On the boots, there was a mixture of at least three individuals' bloods. Kukosky was unable to determine any of the individuals.

Kukosky also tested the gun found in the snowbank. There was a mixture of at least two individuals' DNA on the gun's safety and trigger, but there was not enough to determine the sources of the DNA. There was a mixture of at least three individuals' DNA on the gun's grip and the tape, but there was not enough DNA to determine the sources.

## M. The Defendant's Testimony

The Defendant and Shabazz were in a gang. Shabazz told the Defendant, "Come on, we're [going to] go up to Williamsport." The Defendant took his phone on the trip, but it broke before he got to Williamsport. He bought another phone, which needed WIFI to make calls and send and receive text messages. Payton gave the Defendant her WIFI password, so he could use his phone. The Defendant did not bring a gun to Williamsport.

On January 9, 2013, the Defendant, Shabazz, Fulton, and Carpenter left Payton's apartment to buy marijuana. Before they left, Payton gave the Defendant her phone. The Defendant was not sure why Payton gave him the phone, but he thought it might have been because she did not want Fulton to see things on her phone. The Defendant did not have a gun or a backpack when he left Payton's apartment. He knew they were going to get marijuana but did not know where they were going.

While they were walking, Littles and someone else called Payton's phone. The Defendant realized that two different people were calling to sell marijuana. The group wanted to

10

meet with both sellers, so they could see who had the better marijuana for the next buy. Carpenter and Fulton went one way while the Defendant and Shabazz went another way.

The Defendant and Shabazz did not discuss robbing the marijuana seller, and the Defendant did not know whether the seller had a lot of money or drugs. Shabazz said that he was going to pay for the marijuana. While they were walking, the Defendant was wearing headphones and listening to music.

When Littles called Payton's phone, the Defendant took out one headphone, so he could talk with Littles. Littles said he was in a vehicle and described the vehicle. The Defendant told Littles that he saw the vehicle, and Littles told the Defendant to keep walking. The Defendant hung up and put his headphone back in.

The Defendant saw Littles exit a truck and approach him and Shabazz. The Defendant was still wearing headphones and listening to music. Littles started talking with Shabazz, but the Defendant did not know what was said because he was wearing headphones. The Defendant followed Littles and Shabazz into an alley.

The Defendant was walking in the alley and trying to find WIFI, so he could use his phone. He had to get out of the way of a truck that came into the alley, so he went into a parking lot. The Defendant was not facing Shabazz and Littles because he was trying to find WIFI. Five to ten seconds after the truck pulled into the alley, the Defendant heard a gunshot. He ran because he thought somebody was shooting at him. At first, he did not know where he was going, but he eventually recognized the street with Payton's apartment. He saw Shabazz, Fulton, and Carpenter on the street. Shabazz told him to start walking, and the four went to Payton's apartment.

Once in the apartment, Shabazz asked Payton for bleach, but the Defendant did not know why. Shabazz asked the Defendant to enter the bathroom. In the bathroom, Shabazz started

11

washing his hands with the bleach. Shabazz asked the Defendant if Shabazz had blood on him. The Defendant then realized that Shabazz had shot somebody.

After Shabazz and the Defendant exited the bathroom, Payton received a phone call. Payton was acting funny and asked to talk with Fulton. The Defendant heard Fulton tell Shabazz that the guy died. They started making calls to leave Williamsport. The Defendant did not go to the police because he was scared that Shabazz would kill him or his family if he went to the police.

The group left Payton's apartment and went to Milton. Shabazz's mother came to Milton and took Shabazz and the Defendant back to Easton. Once they got back to Easton, Shabazz told the Defendant not to talk to the police. On January 19, 2013, police came to the Defendant's house. The Defendant ran because he did not want to be questioned about what happened.

The Defendant never had a conversation with Wood in Lycoming County Prison. While in prison, a messenger told the Defendant that Shabazz wanted the Defendant to tell someone to get the gun. The Defendant discovered that Shabazz was trying to frame him for the shooting. The Defendant called a friend to get the gun because the Defendant wanted to give it to the police, so police could see that neither his fingerprints nor his DNA was on the gun. The Defendant was going to have his friend give the gun to his stepmother and then have her give it to the Defendant's lawyer, but the gun was found before the friend came to the prison. The Defendant knew that Shabazz's DNA would be on the gun. In Easton, the Defendant had seen Shabazz with a gun that Shabazz called "Bishop." Shabazz would not let anyone else touch his gun. The Defendant did not know that Shabazz had a gun with him in Williamsport.

In prison, the Defendant received a letter from Shabazz's girlfriend. She said that Shabazz said that the Defendant should take the blame for the shooting because the Defendant would get less time than Shabazz. The Defendant threw away the letter.

12

## N. The Defendant's Arguments

On appeal, the Defendant makes the following arguments. First, the Court erred in denying the Defendant's pre-trial motion, which requested the dismissal of the robbery counts and the conspiracy to commit robbery count. Second, the Court erred in denying the Defendant's motion for judgment of acquittal on the robbery counts, the conspiracy to commit robbery count, and the second-degree murder count. Third, the Commonwealth failed to present sufficient evidence for the jury to find the Defendant guilty of robbery, conspiracy to commit robbery, and second-degree murder. Fourth, the Court erred in denying the Defendant's motion to suppress his statements after his arrest. Fifth, the Court erred when it precluded the introduction of evidence relating to the witnessing of Shabazz's prior use of firearms and possession of illegal ammunition. Sixth, the Court erred in permitting the Commonwealth to play recorded phone conversations involving the Defendant when there was no probative value to the conversations. Seventh, the Court erred in allowing the jury to use transcripts of the recorded phone conversations. Eight, the Court erred in permitting the Commonwealth to use a sketch not based on any testimony or other evidence. Ninth, the verdict was inconsistent and against the weight of the evidence.

## II. Discussion

For the Defendant's first and fourth arguments, the Court will rely on its Opinion filed September 30, 2013.

## A. The Commonwealth Presented Sufficient Evidence for the Jury to Find the Defendant Guilty of Robbery (Threaten With or Intentionally Put in Fear of Serious Bodily Injury).

"When reviewing the sufficiency of the evidence in a criminal case, the test is whether the evidence admitted at trial is sufficient to prove every element of the crime charged beyond a

13

reasonable doubt. The reviewing court views the evidence in a light most favorable to the Commonwealth as the verdict winner and accepts as true all evidence and all reasonable inferences therefrom upon which, if believed, the fact finder could properly have based its verdict." Commonwealth v. Turner, 568 A.2d 622, 624 (Pa. Super. 1989) (citations omitted). "Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." Commonwealth v. Cassidy, 668 A.2d 1143, 1144 (Pa. Super. 1995).

"An individual commits a robbery . . . if, in the course of committing a theft, he 'threatens another with or intentionally puts him in fear of immediate serious bodily injury.'" Commonwealth v. Rodriguez, 673 A.2d 962, 966 (Pa. Super. 1996) (quoting 18 Pa.C.S. § 3701 (a)(1)(ii)). "An act is deemed in the 'course of committing a theft' if it occurs in an attempt to commit theft or in flight after the commission of the theft." Commonwealth v. Ford, 650 A.2d 433, 437 (Pa. 1994). "The threat posed by the appearance of a firearm is calculated to inflict fear of deadly injury, not merely fear of 'serious bodily injury.' A factfinder is entitled to infer that a victim was in mortal fear when a defendant visibly brandished a firearm." Commonwealth v. Hopkins, 747 A.2d 910, 914-15 (Pa. Super. 2000) (citations omitted).

Here, Wood testified that the Defendant said "his bro brought him down here to rob people." Shabazz testified to the following:

> The Defendant asked for permission to rob Littles and Shabazz gave the Defendant permission. As Littles was walking towards them, the Defendant said it was "a go." The Defendant wanted to go into the alley. In the alley, the Defendant pulled out a gun.

In addition, Wood testified that the Defendant said that he got about three bags of marijuana from Littles. Such evidence is sufficient for a jury to find that the Defendant committed robbery.

14

**B. The Commonwealth Presented Sufficient Evidence for the Jury to Find the Defendant Guilty of Second-Degree Murder.**

"Murder of the second degree is a criminal homicide committed while a defendant was engaged as a principal or an accomplice in the perpetration of a felony. 18 Pa.C.S.A § 2502(d) defines perpetration of a felony as: the act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery . . . ." Commonwealth v. Lambert, 795 A.2d 1010, 1015 (Pa. Super. 2002) (quoting 18 Pa.C.S. § 2502(d)). "[A]ll the felony murder statute requires is for the jury to conclude that a criminal homicide was committed while the defendant participated in a completed or an attempted delineated, i.e., predicate, offense." Commonwealth v. Miller, 35 A.3d 1206, 1212 (Pa. 2012) (quoting Commonwealth v. Austin, 906 A.2d 1213, 1220 (Pa. Super. 2006)).

As discussed in the previous section, the evidence was sufficient for a jury to find that the Defendant committed robbery. The evidence was also sufficient for a jury to find that Littles was killed while the Defendant was engaged in the robbery. Wood testified that the Defendant said he shot Littles in the face after Littles did not give up his drugs. Shabazz testified that he heard a bang after Littles went for the Defendant's gun. Such evidence is sufficient for a jury to find the Defendant guilty of second-degree murder.

**C. The Commonwealth Presented Sufficient Evidence for the Jury to Find the Defendant Guilty of Conspiracy to Commit Robbery.**

"To sustain a conviction for criminal conspiracy, the Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and (3) an overt act was done in furtherance of the conspiracy." Commonwealth v. Hennigan, 753 A.2d 245, 253 (Pa. Super. 2000).

15

Here, Wood testified that the Defendant said "his bro brought him down here to rob people." Shabazz testified that he gave the Defendant permission to rob Littles. Shabazz also testified that the Defendant said it was "a go." Finally, Shabazz testified that the Defendant wanted to go into the alley, and once in the alley, the Defendant pulled out a gun. Such evidence is sufficient for a jury to find that the Defendant conspired with Shabazz to commit robbery.

**D. The Court did not Err in Precluding Evidence Related to the Witnessing of Shabazz's Prior Use and Possession of Firearms Because the Evidence was Being Offered Only to Show that Shabazz had a Propensity for Violence and Carrying Weapons.**

Defense Counsel made the following argument in attempting to introduce evidence related to the witnessing of Shabazz's prior use and possession of firearms:

> **Defense Counsel:** Your Honor, what I want to do, this is obviously a violent crime . . . and [Shabazz] was asked specifically questions by Trooper Davis about violence in his life and what he was involved in and also the fact that the night he got arrested in Easton he's seen carrying a rifle and I want to get into that, that he has a propensity for carrying weapons because he also has outstanding charges in New Jersey. He's been indicted for possession of a firearm that he was arrested when it was tucked into his pants. The only reason that case is not disposed of is because he's been sitting up here. I want to get into that as well.
>
> **Prosecutor:** And none of which is relevant to this trial under the rules of evidence.
>
> **Defense Counsel:** It goes to this guy has a tendency – a propensity for violence.

N.T., 9/15/14, at 131-32.

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(1), (2). Here, the evidence was not admissible because it was being offered only to show

16

that Shabazz had a propensity for violence and carrying weapons. Therefore, the Court did not err in precluding the evidence.

**E. The Court did not Err in Permitting the Commonwealth to Play Recorded Phone Conversations of the Defendant as the Prosecutor Articulated the Probative Value of the Conversations.**

The Commonwealth introduced phone conversations that the Defendant had while in the Lycoming County Prison. Defense Counsel objected to the conversations on the ground that they were not relevant. The prosecutor argued that the conversations were probative for the following reasons:

> Your Honor, I would argue that the probative value is clear. There is testimony from Isaiah Fulton that they call the gun Bishop, that Bishop was brought up with them. . . [The Defendant] has denied knowledge of any type of gun, has denied knowledge of a gun being transported or existing. And this goes to refute that as well. . . [T]he foundation has been laid through previous testimony that if the jury believes that this gun was called Bishop that the jury can then infer and believe based upon this conversation that [the Defendant] has knowledge of the gun and that he is admitting such.

N.T., 9/18/14, at 93-94.

"Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence." Pa.R.E. 401(a). "All relevant evidence is admissible." Pa.R.E. 402. Because the prosecutor articulated the probative value of the conversations, the Court did not err in permitting the Commonwealth to play the conversations.

17

**F. The Court did not Err in Permitting the Jury to Have Transcripts of the Recorded Conversations Because Defense Counsel Agreed that the Transcripts were Accurate and the Court Instructed the Jury on How to Use the Transcripts.**

Defense Counsel objected to the jury receiving transcripts of the phone conversations. In Commonwealth v. Bango,[11] the Supreme Court of Pennsylvania discussed why a trial court did not abuse its discretion when it permitted the jury to use transcripts of tape recorded conversations:

> Here, in light of the meticulous care taken by the trial court to ensure that the jury understood that the transcripts were to be used only as guideposts and not as verbatim translations, we cannot characterize the trial court's decision to permit the jury to use the transcripts as manifestly unreasonable. It is axiomatic that a trial is a search for the truth. The jury should be assisted, not hindered, in conducting that search. . . . Not only did the trial court appropriately instruct the jurors that they could review the transcripts for these narrowly circumscribed purposes, but the court also clearly instructed the jury that they, as jurors, were independently responsible for ascertaining the content of the tapes. . . .
>
> As the Superior Court properly noted, this is the conclusion that has been reached uniformly by the federal circuit courts that have addressed this issue, all of which have determined that it is permissible for jurors to review transcripts of tapes so long as a limiting instruction is issued and the person responsible for the transcription can be cross-examined with the opportunity for an alternative transcription to be presented by the defendant.

742 A.2d at 1073.

Here, Defense Counsel was given an opportunity to compare the transcripts to the calls. Defense Counsel said, "[I]t sounds fairly accurate." N.T., 9/18/14, at 95. In addition, Defense Counsel did not dispute that the court reporter prepared the transcripts as accurately as she could. Id. at 96. The Court gave the following instruction to the jury:

> [T]he Commonwealth is going to provide you some transcripts of what the person who prepared them believes is being said during the course of the transcript. This is just merely used as an aid to assist you in understanding what's being said on the audio recording. Please do not take what is in the transcript as gospel because, in fact, if you hear something different than what's written in the transcript it's your recollection, your perception, your understanding of what you hear that controls. These are just merely an aid.

---

[11] 742 A.2d 1070 (Pa. 1999).

Id. at 99-100. Because Defense Counsel agreed that the transcripts were accurate, and the Court instructed the jury on how to use the transcripts, the Court did not err in permitting the jury to have the transcripts.

**G. The Court did not Err in Permitting the Commonwealth to Use a Visual Aid during Closing Argument Because the Aid was Supported by Shabazz's Testimony.**

During closing argument, the Commonwealth used a visual aid that showed the alleged positions of the Defendant, Shabazz, and Littles in the parking lot. Defense Counsel objected to the aid on the grounds that it had not been admitted into evidence and was not based on any testimony. The prosecutor argued that the aid was based on evidence:

> But I wanted to state that Mirad Shabazz in his testimony indicates that at the time of the shooting [the Defendant] was standing in direct front of him in a south direction and that the victim was to his left.

N.T., 9/18/14, at 184.

"It is well settled that a prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence." Commonwealth v. Judy, 978 A.2d 1015, 1020 (Pa. Super. 2009) (quoting Commonwealth v. Holley, 945 A.2d 241, 250 (Pa. Super. 2008)). Shabazz testified about his position at the time of the shooting:

> **Prosecutor:** Where was [the Defendant] in relation to you at the time the gun went off?
>
> **Shabazz:** Like in front of me.
>
> **Prosecutor:** When you say in front you just mean --
>
> **Shabazz:** In front of me.
>
> **Prosecutor:** Where was the eventual victim, the boy that was shot, where was he?
>
> **Shabazz:** Like to the left side of me.

19

N.T., 9/15/14, at 109. Because Shabazz testified that the Defendant was in front of him and Littles was to his left, the Commonwealth's visual aid was supported by evidence. Therefore, the Court did not err in allowing the Commonwealth to use the aid.

**H. The Verdicts are Allowed to Stand Because the Evidence was Sufficient to Support the Convictions.**

"[U]nder longstanding federal and state law, [inconsistent verdicts] are allowed to stand so long as the evidence is sufficient to support the conviction." Miller, 35 A.3d at 1208. As discussed in Sections II., A., B., and C., the evidence was sufficient to support the convictions for robbery, second-degree murder, and conspiracy to commit robbery. Therefore, the verdicts are allowed to stand.

**I. The Verdicts are not Against the Weight of the Evidence Because the Testimony of Shabazz and Wood is not so Tenuous, Vague, and Uncertain that the Verdicts Shock this Court's Sense of Justice.**

"A verdict is against the weight of the evidence 'only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice.'" Commonwealth v. VanDivner, 962 A.2d 1170, 1177-78 (Pa. 2009) (quoting Commonwealth v. Cousar, 928 A.2d 1025, 1036 (Pa. 2007)). "For a new trial to be awarded on this challenge, the evidence must be 'so tenuous, vague and uncertain that the verdict shocks the conscience of the court.'" Commonwealth v. La, 640 A.2d 1336, 1351 (Pa. Super. 1994) (quoting Commonwealth v. Edwards, 582 A.2d 1078, 1083 (Pa. Super. 1990)). "The weight of the evidence is exclusively for the finder of fact who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses." Commonwealth v. Johnson, 668 A.2d 97, 101 (Pa. 1995).

20

Here, Shabazz testified that after he gave the Defendant permission to rob Littles, the Defendant said it was "a go" and pulled out a gun. Wood testified that the Defendant said he came to Williamsport to rob people and "shot the kid in the face" after the kid did not surrender his drugs. The jury received the corrupt and polluted source instruction with regard to Shabazz. See N.T., 9/19/14, at 49-51. It was aware of Wood's motive in testifying and was also instructed to consider whether witnesses had any "bias, prejudice, or other motive that might affect their testimony." See N.T., 9/16/14, at 26, 35-38; N.T., 9/19/14, at 73. Shabazz and Wood's testimony is not so tenuous, vague, and uncertain that the verdicts shock this Court's sense of justice. Therefore, the verdicts are not against the weight of the evidence.

## III. Conclusion

The Commonwealth presented sufficient evidence for the jury to find the Defendant guilty of robbery, second-degree murder, and conspiracy to commit robbery. The Court did not err in precluding evidence related to the witnessing of Shabazz's prior use and possession of firearms because the evidence was being offered only to show that Shabazz had a propensity for violence and carrying weapons. The Court did not err in permitting the Commonwealth to play recorded phone conversations of the Defendant as the prosecutor articulated the probative value of the conversations. The Court did not err in permitting the jury to have transcripts of the recorded conversations because Defense Counsel agreed that the transcripts were accurate and the Court instructed the jury on how to use the transcripts. The Court did not err in permitting the Commonwealth to use a visual aid during closing argument because the aid was supported by Shabazz's testimony. The verdicts are allowed to stand because the evidence was sufficient to support the convictions. The verdicts are not against the weight of the evidence because the testimony of Shabazz and Wood is not so tenuous, vague, and uncertain that the verdicts shock this Court's sense of justice.

21

The Court respectfully requests that its sentencing order of September 19, 2014 be affirmed.

DATE: 24 March 15

By the Court,

Nancy L. Butts, President Judge

cc:    Robert Hoffa, Esq.
       DA

22